VINCENT M. DI RE v. CENTRAL LIVESTOCK
ORDER BUYING COMPANY.
FRANK T. STARKEY, COMMISSIONER OF
EMPLOYMENT SECURITY,
RESPONDENT.[1]

January 27, 1956.

No. 36,711.

[1]Reported in 74 N. W. (2d) 518.

*Harold Jordan,* for relator.

*Miles Lord,* Attorney General, and *Harley G. Swenson,* Assistant Attorney General, for respondent commissioner of employment security.

DELL, CHIEF JUSTICE.

Certiorari to review a decision of the commissioner of employment security[2] allowing the employee unemployment compensation benefits and charging the same to the employer's experience rating account.

The relator-employer, Central Livestock Order Buying Company, is a wholly owned subsidiary of Central Livestock Association, Inc. The former will be referred to as the subsidiary and the latter as the parent. The parent is a cooperative organization engaged in selling or consigning livestock on a commission basis for over 160,000 farmers from Minnesota, North and South Dakota, and from some points in Canada. Prior to 1941 the parent also engaged in the business of buying livestock for packers or for others who wished to use the livestock for "feeding" purposes. Pursuant to the provisions of a Federal law, the Packers and Stockyards Act, 42 Stat. 159, 7 USCA, § 181, et seq., the parent was required to segregate its buying and selling agencies, resulting in the formation of the subsidiary in 1941 for the purpose of handling the buying functions and activities which previously had been engaged in by the parent. All the stock of the subsidiary is owned by the parent, and the board of

---

[2]Added as a party-respondent under M. S. A. 268.10, subd. 10, pursuant to the motion of the attorney general made at the time of the oral argument.

directors and officers of the parent also constitute the board and are the officers of the subsidiary. The parent has its main offices on the fifth floor of the Exchange Building in South St. Paul and the subsidiary has its offices on the fourth floor of the same building.

The employee, Vincent M. Di Re, commenced working for the subsidiary on June 1, 1953. His duties consisted of paying bills, making bank deposits, preparing trial balances, performing other bookkeeping work, and assisting Mr. Fearing, the branch office manager. He was paid at the rate of $250 per month and worked 40 hours a week with hours from 8:30 a. m. to 5:30 p. m. The employee, 45 years of age, had two years of business college as well as two years of training in business administration at a university. Prior to accepting employment with the subsidiary, the employee had 18 years of experience as a bookkeeper-accountant, including positions as a cost accountant at a rate of pay of $137 per week and as a cost analyst at the rate of pay of $300 per month.

Shortly before January 8, 1955, the employee was notified that a decrease in the company's business necessitated a reduction of the personnel in the office and that, therefore, his services would no longer be needed. His employment was not terminated by the employer because of any dissatisfaction with his services but solely because he had the least seniority of any person working in the office. He was told, however, that there was a position available for him in the office of the parent. This work consisted of checking and matching scale tickets and performing other clerical services. The hours of work offered by the parent were from 9:30 a. m. to 6:30 p. m. and the rate of pay was $250 per month. For reasons which will be discussed later, the employee refused to accept the position. This offer was renewed in a letter to the employee dated February 4, 1955, and was again refused.

On January 10, 1955, the employee filed a claim for unemployment compensation benefits with the Department of Employment Security. On February 2, 1955, a claims deputy of said department filed his determination holding that the claim was valid. Upon appeal and further hearing the decision of the claims deputy was affirmed by

an appeal tribunal of the department, which decision, upon appeal, was likewise affirmed by the commissioner of employment security.

■ The subsidiary contends that the two companies must be deemed to be a single employer within the meaning of the Unemployment Compensation Act and that, therefore, the new position offered the employee was merely a "transfer" within the same employment. It argues that the termination of the employment was the voluntary act of the employee and, since it was not for "good cause attributable to the employer" under M. S. A. 268.09, subd. 1(1),[3] the employee is disqualified from receiving any benefits under the act. On the other hand, it concedes that, if the two companies were separate employers, then there was an *involuntary* termination of the employment which would not disqualify the employee from receiving unemployment benefits under the provisions of said section.

A corporation is an artificial person, created by law, or under authority of law, as a distinct legal entity, with rights and liabilities which are independent from those of the natural persons composing the corporation.[4] Ordinarily two or more corporations are considered separate and distinct entities even though the same individuals are the incorporators of, or own stock in, the several corporations, and even though such corporations may have the same persons as officers.[5]

In the instant case, due to the provisions of the Packers and Stockyards Act, the parent was faced with the choice of segregating its buying and selling activities or, in the alternative, of discontinuing one of these branches of its business altogether. It decided to separate the two functions and, as a result, the subsidiary was

---

[3]M. S. A. 268.09, subd. 1. "An individual shall be disqualified for benefits: "(1) If such individual voluntarily and without good cause attributable to the employer discontinued his employment with such employer * * *."

[4]Gallagher v. Germania Brewing Co. 53 Minn. 214, 54 N. W. 1115; Matthews v. Minnesota Tribune Co. 215 Minn. 369, 10 N. W. (2d) 230, 147 A. L. R. 147; 1 Fletcher, Cyclopedia Corporations (Perm. ed.) § 1; 4 Dunnell, Dig. (3 ed.) § 1969.

[5]Belle City Malleable Iron Co. v. Clark, 172 Minn. 508, 215 N. W. 855; 18 C. J. S., Corporations, § 5j.

formed as a separate corporation in 1941. The two corporations were engaged in entirely different aspects of the livestock business. Their offices are on different floors of the Exchange Building and they maintain separate payroll records, as well as separate books of account. There is no question but that, if these corporations had been organized or used as an instrument to hinder, delay, or defraud creditors, or for any other wrongful purposes, then we would be justified in disregarding the separate and distinct corporate existence of the subsidiary.[6] However, in the instant case the subsidiary's separate existence was required because of the provisions of the Packers and Stockyards Act, 42 Stat. 159, 7 USCA, § 181, et seq., and no claim is made that it was formed for fraudulent or wrongful purposes. In the absence of a claim and showing of fraud or other wrongful purposes, the subsidiary must be treated as a legal entity separate and apart from the parent.[7]

Relator argues that the definition of "employer" contained in M. S. A. 268.04, subd. 10(4), compels a finding that these two corporations are to be treated as one employing unit in applying the provisions of the Unemployment Compensation Act. The pertinent provisions of that section are as follows:

"Subd. 10. 'Employer' means: * * *;

\* \* \* \* \*

"(4) Any employing unit which, together with one or more other employing units, is owned or controlled (by legally enforceable means or otherwise) directly or indirectly by the same interests, or which owns or controls one or more other employing units (by legally enforceable means or otherwise) and which, if treated as a single unit with such other employing units or interests or both, would be an employer under clause (1) of this subdivision;"

[6]Matchan v. Phoenix Land Investment Co. 159 Minn. 132, 198 N. W. 417; Central Motors & Supply Co. Inc. v. Brown, 219 Minn. 467, 18 N. W. (2d) 236.

[7]4 Dunnell, Dig. (3 ed.) § 1969; 18 C. J. S., Corporations, § 7e; Whitney v. Leighton, 225 Minn. 1, 30 N. W. (2d) 329.

Section 268.04, subd. 10 (4), has heretofore been interpreted by this court in El Queeno Distributing Co. v. Christgau, 221 Minn. 197, 21 N. W. (2d) 601. In that case a copartnership reorganized and thereafter two separate corporate entities succeeded to various activities of the copartnership's enterprises. The question there presented was whether the successor corporations were entitled to the contribution rate of the predecessor copartnership. The relators in that case contended that since under § 268.04, subd. 10 (4), all employing units controlled by the same interests are to be treated as a single unit for the purpose of determining the controlling unit's subjectivity to the act, therefore, all such units should be entitled to the experience rating of the controlling unit. We answered that contention as follows (221 Minn. 201, 21 N. W. [2d] 603) :

"* * * An examination of § 268.04, subd. 10, however, indicates that its purpose is to define the term 'employer' in such a manner as to prevent subject employers from escaping liability for contributions under the act by splitting their organizations into various parts (each into smaller units). *It has no reference to the objectives here sought by relators.*" (Italics supplied.)

Although the issue in that case differed from the one now before us, we fail to see any valid reason for placing a different interpretation on § 268.04, subd. 10 (4), here than that adopted in the El Queeno case. Other states having similar statutory provisions have placed a like interpretation upon them.[8] In discussing the "majority control" provisions contained in the various state unemployment compensation acts in 1 CCH, Unemployment Ins. Rep. Fed. par. 1311, it is stated at p. 2175 :

"* * * In most states this grouping of business enterprises which are commonly owned or controlled is for the *single purpose* of deter-

---

[8]Ned's Auto Supply Co. v. Unemployment Comp. Comm. 313 Mich. 66, 20 N. W. (2d) 813; Godsol v. Unemployment Comp. Comm. 302 Mich. 652, 5 N. W. (2d) 519, 142 A. L. R. 910; State v. Kitsap County Bank, 10 Wash. (2d) 520, 117 P. (2d) 228; State v. Dallas Liquor Warehouse No. 4, 147 Tex. 495, 217 S. W. (2d) 654.

mining whether each separate enterprise may be treated as a subject employer." (Italics supplied.)

It is a familiar rule that, although a case may fall within the letter of the statute, yet it may not be within the statute because not within the spirit nor within the intention of its makers.[9] Section 268.04, subd. 10(4), was enacted for a limited purpose, namely, to prevent employers who would otherwise come within the terms of the act from evading the statute through various forms of distintegrated ownership and control, and was not meant to cover a situation such as the one now before us. We, therefore, hold that the parent and the subsidiary are, in fact, two separate and distinct corporate beings and that the positions in question were completely independent of each other. Thus, when the employee's position with the subsidiary was abolished he was forced to terminate his employment through no choice of his own and was not disqualified under § 268.09, subd. 1(1), from receiving benefits under the Unemployment Compensation Act.

■ Relator further contends that the employee was not eligible to receive unemployment benefits because he was not "available for work" within the meaning of § 268.08, subd. 1(3), which reads in part as follows:

"An individual shall be eligible to receive benefits with respect to any week of unemployment only if the commissioner finds that:

\* \* \* \* \*

"(3) He was able to work and was available for work, \* \* \*."

It asserts that the reason the employee refused to accept the position offered by the parent was because the quitting time of the proffered employment was 6:30 p. m. rather than 5:30 p. m. Relying on our decision in Swanson v. Minneapolis-Honeywell Regulator Co. 240 Minn. 449, 61 N. W. (2d) 526, it argues that the employee failed

---

[9] Church of the Holy Trinity v. United States, 143 U. S. 457, 12 S. Ct. 511, 36 L. ed. 226; United States v. American Trucking Assns. Inc. 310 U. S. 534, 60 S. Ct. 1059, 84 L. ed. 1345; 17 Dunnell, Dig. (3 ed.) § 8940(1); Edberg v. Johnson, 149 Minn. 395, 184 N. W. 12.

to make himself "available for work" as required by the statute. The Swanson case is readily distinguished from the instant case and thus is not determinative or controlling of the issue now before us. In that case the employee flatly refused to accept work commencing at either 7 or 7:30 a. m., not for any reason connected with the character of the work itself but because of reasons purely personal to her. We there held that (240 Minn. 456, 61 N. W. [2d] 531) "a person is not available for work within the meaning of the statute unless he is accessible or attainable for work when suitable work is offered at such hours as are customary in the type of employment to which he is suited."

The evidence before us is not sufficient to compel a finding that the employee refused the proffered employment solely because the quitting time was 6:30 p. m. To the contrary, it appears that the employee merely expressed a preference not to work to such a late hour rather than giving an adamant refusal to work past a quitting time of 5:30 p. m. The evidence permitted a finding that the employee's reason for refusing the offered employment was that the work would not utilize his recent employment experience or his past 18 years of bookkeeping, accounting, and supervisory experience and would afford a poor opportunity for advancement. In view of these circumstances, the commissioner did not err in refusing to apply the reasoning of the Swanson case to the facts of the instant case. We hold that the employee was "able to work" and was "available for work" within the meaning of § 268.08, subd. 1(3).

The final issue raised by this appeal is whether the commissioner correctly applied § 268.09, subd. 1(5), in finding that the employment offered the employee by the parent was not "suitable work." Section 268.09, subd. 1(5), in part is as follows:

"An individual shall be disqualified for benefits:

\*　　\*　　\*　　\*　　\*

"(5) If the commissioner finds that he has failed, without good cause, either to apply for available, suitable work when so directed by the employment office, or the commissioner or to accept suitable work when offered him, \* \* \*.

"(a) In determining whether or not any work is suitable for an individual, the director shall consider the degree of risk involved to his health, safety, and morals, his physical fitness and prior training, his experience, his length of unemployment *and prospects of securing local work in his customary occupation,* and the distance of the available work from his residence." (Italics supplied.)

The commissioner held that the work offered the employee was not substantially the same type of work that he had been performing, namely, that of a bookkeeper-accountant and that, therefore, it was not "suitable work" within the meaning of the statute.

While some doubt may exist as to the actual difference in the nature of the work the employee was performing with the subsidiary as compared to that offered by the parent, we cannot say that the evidence is insufficient to sustain the finding of the commissioner that the two positions were substantially different. The finding is not questioned on this appeal due to the well-established rule that, where there is evidence reasonably tending to support the findings of the commissioner, they will not be disturbed on review.[10] It is clear that under § 268.09, subd. 1(5), the commissioner is vested with wide discretion in determining whether offered work is "suitable" for a particular individual. However, that section specifies certain standards or guideposts to which the commissioner must conform in making his determination of what is suitable work in a particular case. Here the commissioner failed to conform to these statutory standards in making his determination that the proffered position was unsuitable.

. The procedure to be followed by the commissioner in making his determination of "suitable work" was prescribed by this court in Berthiaume v. Christgau, 218 Minn. 65, 70, 15 N. W. (2d) 115, 118, as follows: "* * * in determining whether any available work is *suitable,* the director [commissioner] shall first consider the prospects of the applicant's obtaining local work in his customary occu-

---

[10]Honeymead Products Co. v. Christgau, 234 Minn. 108, 47 N. W. (2d) 754; Chellson v. State Div. of Employment & Security, 214 Minn. 332, 8 N. W. (2d) 42; 1 Dunnell, Dig. (3 ed.) § 397b.

pation." We further said: "* * * should it be determined as a question of fact that a claimant has no prospect of returning to his usual trade within a reasonable time, then work in some other trade for which he is reasonably fitted and which meets the other requirements specified in § 5(E)(1) [substantially identical to the present § 268.09, subd. 1(5)] may become suitable, and the burden falls upon him to establish that he has held himself available therefor, as well as for work in his own trade, * * *." Thus it is not required in all cases that "suitable work" be substantially identical to the previous employment or occupation of the employee. Other work may meet the requirements of "suitable work" if there are no prospects of obtaining work in the employee's usual trade or occupation within a reasonable time. We defined "suitable work" in Swanson v. Minneapolis-Honeywell Regulator Co. (240 Minn. 457, 61 N. W. [2d] 531) to be "such work as the employee customarily performs *or such as he is reasonably fitted to perform by past experience or training and which is otherwise suitable under the provisions of § 268.09, subd. 1(5)*." (Italics supplied.) If in the instant case there were no prospects of securing substantially equivalent employment within a reasonable time, then on the record here, in view of the employee's past experience and training, the employment tendered by the parent was "suitable work" within the definition of that term as stated in the Swanson case.

The Unemployment Compensation Act was never intended as a guarantee that an employee would always receive benefits unless he was offered employment of precisely the same kind or character as that of his most recent employment. The purpose of the act is to assist those who are unfortunate enough to be involuntarily unemployed,[11] not to benefit those who capriciously refuse similar work

---

[11] § 268.03. "As a guide to the interpretation and application of sections 268.03 to 268.24, the public policy of this state is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burdens. * * * The legislature, therefore, declares that in its considered judg-

for which they are reasonably fitted by past training and experience.[12] Admittedly, the development and preservation of worker skills and the advancement and utilization of the employee's full training is a desirable and important factor in administering the Unemployment Compensation Act, but a modification of that objective is required when a particular skill or trade is not in demand either because of protracted economic conditions or because of technological changes.[13] Suitability is not a matter that can be rigidly determined, but rather depends on various factors, an important one of which is the present expectancy of obtaining other employment similar to the employee's customary occupation.[14]

Here the commissioner made no finding concerning the employee's prospects of securing local work in his customary occupation within a reasonable time, nor is there sufficient evidence on the record before us from which we can rule on the question as a matter of law. The employee argues in his brief that, "As a matter of common knowledge it would seem that in the Twin Cities area in January 1955 there should be a reasonable demand for the services of an experienced male bookkeeper-accountant." Yet, the employee testified that when he left his job with the subsidiary he had no prospects for other employment. Moreover, he was still unemployed at the time of the hearing before the appeal tribunal in March 1955 and relator asserts the belief that he received unemployment compensation for the maximum period allowed under the statute. In these cases, what is a reasonable length of time in which to seek substantially equiva-

ment the public good and the general welfare of the citizens of this state will be promoted by providing, under the police powers of the state for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own."

[12]Beecham v. Falstaff Brewing Corp. 150 Neb. 792, 36 N. W. (2d) 233; Nowak v. Board of Review, 150 Ohio St. 535, 83 N. E. (2d) 208.

[13]8 Vanderbilt L. Rev. 331; 7 CCH, Unemployment Ins. Rep. Pa. par. 1965, p. 41,243; Colin, The Law of Unemployment Insurance in New York, p. 269.

[14]Berthiaume v. Christgau, 218 Minn. 65, 15 N. W. (2d) 115; Pacific Mills v. Director of Div. of Employment Security, 322 Mass. 345, 77 N. E. (2d) 413.

lent employment cannot be stated in concise or definitive terms;[15] it is a fact question which must be determined by looking to the particular facts and circumstances involved in each individual case. Thus in order to properly apply the statutory standards set out in § 268.09, subd. 1(5), there must be additional evidence taken by the commissioner in the instant case in order to determine whether the employee did have prospects of securing local work in his customary occupation and also to determine what was a reasonable length of time to seek such employment. The case must, therefore, be remanded for further proceedings before and additional findings by the commissioner consistent with this opinion.

Remanded.

[15] 8 Vanderbilt L. Rev. 329; Colin, The Law of Unemployment Insurance in New York, p. 269.

